## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## ROCK ISLAND DIVISION

CAROLYN C. LUCKEY, on behalf of herself
and all others similarly situated,

        Plaintiff,

v.

TBK BANK, SSB,

        Defendant.

JURY DEMAND

Case No.

### CLASS ACTION COMPLAINT

Plaintiff Carolyn C. Luckey, on behalf of herself and all persons similarly situated, alleges

the following based on personal knowledge as to allegations regarding herself and on information

and belief as to others:

### INTRODUCTION

1.    Plaintiff brings this action on behalf of herself and a class of similarly situated

individuals against Defendant TBK Bank, SSB ("Defendant") over the improper assessment and

collection of $31 OD Fees[1] on debit card transactions authorized on sufficient funds.

2.    Besides being deceptive, this practice breaches Defendant's standardized adhesion

contract attached as Ex. A hereto (the "Deposit Agreement") and Ex. B hereto (the "OD Opt-In

Form") (collectively, the "Contract").

3.    The practice also breaches Defendant's duty of good faith and fair dealing, unjustly

enriches Defendant to the detriment of its customers, violates the Illinois Consumer Fraud and

---

[1] Since the time Plaintiff was assessed these fees, Defendant has raised its fee to $34 per
item.

Deceptive Practices Act, 815 ILCS 505/1 *et seq*. ("ICFA") and violates the Electronic Fund Transfers Act (Regulation E) C.F.R. § 1005 *et seq*. (authority derived from 15 U.S.C. § 1693 *et seq*.)).

4.    Through the imposition of these fees, Defendant has made substantial revenue to the tune of millions of dollars, seeking to turn its customers' financial struggles into revenue. Plaintiff, like thousands of others, has fallen victim to Defendant's fee revenue maximization schemes.

## PARTIES

5.    Plaintiff is a citizen of Illinois and a resident of Rock Island County, Illinois, which is in this District.

6.    Defendant is a citizen of Texas with more than $6.0 billion in assets that does business in Illinois, including in this District.

## JURISDICTION AND VENUE

7.    This Court has original jurisdiction over this putative class action lawsuit pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d)(2) & (6), because the aggregate sum of the claims of the members of the putative Class exceeds $5 million, exclusive of interest and costs, because Plaintiff brings this action on behalf of a proposed Class that is comprised of over one hundred members, and because at least one of the members of the proposed Class is a citizen of a different state than Defendant.

8.    This Court also has original jurisdiction under 28 U.S.C. §§ 1331 because this case involves a federal question as Plaintiff alleges violations of the Electronic Fund Transfers Act (Regulation E) C.F.R. § 1005 *et seq*. (authority derived from 15 U.S.C. § 1693 et seq.)).

4896-0617-2981, v. 1

9.    Furthermore, this Court has supplemental jurisdiction over Plaintiff's claim for breach of contract, including breach of the duty of good faith and fair dealing, because it is so related to Plaintiff's claim for violations of the Electronic Fund Transfers Act (Regulation E) that it forms part of the same case or controversy under Article III of the United States Constitution

10.    This Court has personal jurisdiction over Defendant because Defendant conducted business in and throughout this District at all times material hereto.

11.    Defendant regularly and systematically conducts business and provides retail banking services in this state and provides retail banking services to customers in this state. As such, it is subject to the jurisdiction of this Court.

12.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Defendant resides in this District and a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in this District. Venue is further proper pursuant to 28 U.S.C. § 1391(b)(3) because Defendant is subject to personal jurisdiction in this District.

## FACTS

### I.    BACKGROUND

13.    Overdraft fees and insufficient funds fees ("NSF fees") are among the primary fee generators for banks. According to a banking industry market research company, Moebs Services, in 2018 alone, banks generated an estimated $34.5 billion from overdraft fees. Overdraft Revenue Inches Up in 2018, https://bit.ly/3cbHNKV.

14.    Unfortunately, the customers who are assessed these fees are the most vulnerable customers. Younger, lower-income, and non-white accountholders are among those who were more likely to be assessed overdraft fees. Overdrawn: Consumer Experiences with Overdraft, Pew Charitable Trusts 8 (June 2014), https://bit.ly/3ksKD0I.

3

15.     Because of this, industry leaders like Bank of America, Capital One, Wells Fargo, Alliant, and Ally have made plans to end the assessment of OD or NSF fees entirely. *See* Hugh Son, *Capital One to Drop Overdraft Fees for All Retail Banking Customers*, NBC News (Dec. 1, 2021), https://nbcnews.to/3DKSu2R; Paul R. La Monica, *Wells Fargo Ends Bounced Check Fees*, CNN (Jan. 12, 2022), https://bit.ly/3iTAN9k.

16.     In line with this industry trend, the New York Attorney General recently asked other industry leading banks to end the assessment of all OD Fees by the summer of 2022. *NY Attorney General asks banks to end overdraft fees*, Elizabeth Dilts Marshall, Reuters (April 6, 2022).

17.     The New York Department of Financial Services also recently issued guidance stating that the practice of assessing OD Fees on transactions authorized on sufficient funds. *See* https://www.dfs.ny.gov/industry_guidance/industry_letters/il20220712_overdraft_nsf_fees.

18.     Through the imposition of these fees, Defendant has made substantial revenue to the tune of tens of millions of dollars, seeking to turn its customers' financial struggles into revenue.

## II.    DEFENDANT ASSESSES OVERDRAFT FEES ON DEBIT CARD TRANSACTIONS THAT WERE AUTHORIZED ON SUFFICIENT FUNDS

### A.  The Contract

19.     At all times material hereto, Plaintiff had a checking account governed by the Contract.

20.     The Contract is a standardized form contracts for deposit accounts, the material terms of which are drafted by Defendant, amended by Defendant from time to time at its convenience and complete discretion, and imposed by Defendant on all of its deposit account customers.

### B.  Overview of the Claim

4896-0617-2981, v. 1

21.     Plaintiff brings this action challenging Defendant's practice of charging OD Fees on what are referred to in this Complaint as "Authorize Positive, Settle Negative Transactions," or "APSN Transactions."

22.     Here's how the practice works. At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Defendant immediately reduces consumers' checking accounts for the amount of the purchase, sets aside funds in the checking account to cover that transaction, and adjusts the consumer's displayed "available balance" to reflect that subtracted amount. As a result, customers' accounts will always have sufficient funds available to cover these transactions because Defendant has already held the funds for payment.

23.     However, Defendant still assesses crippling $31 OD Fees on many of these transactions and misrepresents its practices in the Contract.

24.     Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, Defendant later assesses OD Fees on those same transactions when they settle days later into a negative balance. These types of transactions are APSN Transactions.

25.     Defendant maintains a running account balance, tracking funds consumers have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, Defendant holds the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the accountholder and are specifically reserved for a given debit card transaction.

5

26.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498 (Jan. 29, 2009).

27.     That means when any subsequent, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for pending debit card transactions. Therefore, many subsequent transactions incur OD Fees due to the unavailability of the funds held for earlier debit card transactions.

28.     Still, despite always reserving sufficient available funds to cover the transactions and keeping the held funds off-limits for other transactions, Defendant improperly charges OD Fees on APSN Transactions.

29.     The Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> [A] financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners

found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.

At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, "Supervisory Highlights" (Winter 2015).

30.     There is no justification for these practices, other than to maximize Defendant's OD Fee revenue. APSN Transactions only exist because intervening transactions supposedly reduce an account balance. But Defendant is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year.

31.     But Defendant was not content with these millions in OD Fees. Instead, it sought millions more in OD Fees on APSN Transactions.

32.     Besides being deceptive, these practices breach contract promises made in Defendant's adhesion contracts, which fundamentally misconstrue and mislead consumers about the true nature of Defendant's processes and practices. Defendant also exploits its contractual discretion by implementing these practices to gouge its customers.

### C.  Mechanics of a Debit Card Transaction

7

33.     A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from Defendant. When a customer physically or virtually "swipes" their debit card, the credit card terminal connects, via an intermediary, to Defendant, which verifies that the customer's account is valid and that sufficient available funds exist to cover the transaction amount.

34.     At this step, if the transaction is approved, Defendant immediately decrements the funds in a consumer's account and holds funds in the amount of the transaction but does not yet transfer the funds to the merchant.

35.     Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

36.     Defendant (like all banks and credit unions) decides whether to "pay" debit card transactions at authorization. For debit card transactions, that moment of decision can only occur at the point of sale, when the transaction is authorized or declined. It is at that point—and only that point—that Defendant may choose to either pay the transaction or to decline it. When the time comes to actually transfer funds for the transaction to the merchant, it is too late for the bank to deny payment—the bank has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. See Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

37.     There is no change—no impact whatsoever—to the available funds in an account when the transfer step occurs.

**D. Defendant's Contract**

8

38. Plaintiff had a Defendant checking account at all times material hereto, which was governed by the Contract. Exs. A-B.

39. Defendant promises in the Contract that:

> You understand that we may, at our discretion, honor withdrawal requests that overdraw your account.
>
> Generally, an overdraft occurs when there is not enough money in your account to pay for a transaction, but we pay (or cover) the transaction anyway.
>
> If a check, item or transaction is presented without sufficient funds in your account to pay it, you will be charged an NSF or overdraft fee according to our NSF or overdraft fee policy.

*Id.* at 9-10; Ex. B.

40. Defendant also promises that it will immediately reduce the account's available balance to cover the debit card transaction and hold those funds for that debit card transaction:

> **(b) Authorization Holds.** When you use the Card in a POS transaction, the merchant may request an authorization for the transaction at the time of the transaction. In certain circumstances the payment authorization system permits the merchant to request authorization for an amount that may be more or less than the final amount of the transaction, which final amount may be unknown at the time of the transaction (e.g., a restaurant may include in a transaction authorization request an amount sufficient to cover a tip). In connection with a POS authorization request, we may place a hold on your account as directed by the merchant at the time of the transaction. ***This type of hold helps make it more likely that your POS transaction will be completed, by holding funds available for the transaction pending our receipt of documentation from the merchant. Once such a hold is in place, the amount of the hold may not be available to pay any checks, POS transactions or other withdrawal or transfer orders or requests that you or other parties might make.*** The hold will be released when the merchant presents, and we process, supporting documentation for the transaction, or three business days after the transaction date, whichever occurs first. As is the case with all POS transactions, your account will be debited for the exact final amount of the transaction following our processing of the documentation. During the time that a hold is in place, the balance reported to you by means of telephone banking, internet banking, ATM screens or your periodic account statement might not reflect that the hold is or was in place against your account. This is because available balances are sometimes based on actual debits or credits to your account rather than on holds. During the period of any hold, we may, in our discretion, return items presented against your account or decline withdrawal and transfer requests, or we may pay such items and

9

approve such withdrawal and transfer requests, if there are not sufficient funds in your account for such transactions in excess of the amount of the hold.

*Id.* at 30 (emphasis added).

41. In breach of these promises, Defendant assesses $31 OD Fees on debit card transactions when there is "enough money" in the available balance to "cover," "honor" or "pay" the transaction.

42. Defendant further promises that authorization and payment occur simultaneously and that overdrafts will be determined at the time Defendant "authorize[s] and pay[s]" the debit card transaction:

We do ***authorize and pay*** overdrafts for the following types of transactions:

- Checks and other transactions made using your checking account number
- Automatic bill payments

We do not ***authorize and pay*** overdrafts for the following types of transactions unless you ask us to (see below):

- ATM Transactions
- Everyday debit card transactions

We pay overdrafts at our discretion, which means we do not guarantee that we will always ***authorize and pay*** any type of transaction.

If we do not ***authorize and pay*** an overdraft, your transaction will be declined.

. . .

What if I want TBK Bank, SSB to ***authorize and pay*** overdrafts on my ATM and everyday debit card transactions?

If you also want us to ***authorize and pay*** overdrafts on ATM and everyday debit card transactions, call…

I want TBK Bank, SSB to ***authorize and pay*** overdrafts on my everyday debit and ATM transactions for this account.

I do not want TBK Bank, SSB to ***authorize and pay*** overdrafts on my everyday debit card and ATM transactions for this account.

4896-0617-2981, v. 1

Ex. B (emphasis added and removed from original).

43.     In total, Defendant links payment to authorization *8 times*, meaning that transactions are paid, and therefore overdrafts are determined, at authorization.

44.     For debit card transactions, Defendant decides whether to pay a debit card transaction at the moment of authorization. Defendant represents to its customers that authorization and Defendant's payment of overdrafts is one step, just like consumers using debit cards believe.

45.     For APSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there is always enough money to cover the transaction—yet Defendant assesses OD Fees on them anyway.

46.     The above promises indicate that transactions are only overdraft transactions when there is not enough money to cover the transaction at the time the customer swipes his or her debit card to pay for an item. Of course, that is not true for APSN Transactions.

47.     In fact, Defendant actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to post those same transactions. Instead, it uses a secret posting process described below.

48.     All of the above representations and contractual promises are untrue. Defendant charges fees even when sufficient funds exist to cover transactions that are authorized into a positive balance. No express language in any document states that Defendant may impose fees on any APSN Transactions.

49.     First, and most fundamentally, Defendant charges OD Fees on debit card transactions for which there are sufficient funds available to cover throughout their lifecycle.

50.     Defendant's practice of charging OD Fees even when sufficient available funds exist to cover a transaction violates its contractual promise not to do so. This discrepancy between

Defendant's actual practice and the Contract causes consumers like Plaintiff to incur more OD Fees than they should.

51.    Next, sufficient funds for APSN Transactions are actually debited from the account immediately, consistent with standard industry practice.

52.    Because these withdrawals take place upon initiation, the funds cannot be re-debited later. But that is what Defendant does when it re-debits the account during a secret batch posting process.

53.    Defendant's actual practice is to assay the same debit card transaction twice to determine if it overdraws an account—both at the time a transaction of authorization and later at the time of settlement.

54.    At the time of settlement, however, an available balance does not change at all for these transactions previously authorized into positive funds. As such, Defendant cannot then charge an OD Fee on that transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

55.    Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, Defendant releases the hold placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

56.    This secret step allows Defendant to charge OD Fees on transactions that never should have gotten them—transactions that were authorized into sufficient funds, and for which Defendant specifically set aside money to pay.

57.    In sum, there is a huge gap between Defendant's practices as described in the Contract and Defendant's actual practices.

4896-0617-2981, v. 1

58.     Banks and credit unions like Defendant that employ this abusive practice require their accountholders to expressly agree to it—something Defendant here never did.

59.     Indeed, recognizing the complexity of the settlement process for APSN Transactions and the fact that a fee in such circumstances is counterintuitive to accountholders, other banks and credit unions require their accountholders to agree to be assessed OD Fees on APSN Transactions.

60.     For example, Canvas Credit Union states:

Available balance **at the time transactions are posted (not when they are authorized)** may be used to determine when your account is overdrawn. The following example illustrates how this works:

Assume your actual and available balance are both $100, and you swipe your debit card at a restaurant for $60.As a result, your available balance will be reduced by $60 so your available balance is only $40.Your actual balance is still $100.Before the restaurants charge is sent to us for posting, a check that you wrote for $50 clears. Because you have only $40 available. . . . your account will be overdrawn by $10, even though your actual balance was $100 before the check posted. . . Also, when the $60 restaurant charge is presented to the Canvas and posted to your account, you will not have enough money in your available balance because of the intervening check, and you will be charged a fee for that transaction as well, even though your available balance was positive when it was authorized.

*Member Service Agreement, Part 2*, Canvas Credit Union 30 (Nov. 5, 2019), https://bit.ly/3kX0iXo (emphasis in original).

61.     Defendant and its accountholders make no such agreement.

**E. Reasonable Consumers Understand Debit Card Transactions Are Debited Immediately**

62.     Defendant's assessment of OD Fees on transactions that have not overdrawn an account is inconsistent with immediate withdrawal of funds for debit card transactions. This is because if funds are immediately debited, they cannot be depleted by intervening, subsequent

4896-0617-2981, v. 1

transactions. If funds are immediately debited, they are necessarily applied to the debit card transactions for which they are debited.

63.     Defendant was and is aware that this is precisely how its accountholders reasonably understand debit card transactions work.

64.     Defendant knows that consumers prefer debit cards for these very reasons. Consumer research shows that consumers prefer debit cards as budgeting devices because they don't allow debt like credit cards as the money comes directly out of the checking account.

65.     Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." *What Do I Need To Know About Using A Debit Card?*, Consumer Action (Jan. 14, 2019), https://bit.ly/3v5YL62.

66.     This understanding is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States has increased by approximately 1.4 million in the last five years, and with that increasing ubiquity, consumers have viewed debit cards (along with credit cards) "as a more convenient option than refilling their wallets with cash from an ATM." Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases*, MarketWatch (Mar. 23, 2016), https://on.mktw.net/3kV2zCH.

67.     Not only have consumers increasingly substituted debit cards for cash, but they believe that a debit card purchase is the functional equivalent to a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

68. Accordingly, "[o]ne of the most salient themes [in complaints to the CFPB] . . . is the difficulty avoiding overdrafts even when consumers believed they would. Often, this was related to bank practices that make it difficult for consumers to know balance availability, transaction timing, or whether or not overdraft transactions would be paid or declined." Rebecca Borne et al., *Broken Banking: How OD Fees Harm Consumers and Discourage Responsible Bank Products*, Center for Responsible Lending 8 (May 2016), https://bit.ly/3v7SvL1.

69.    In fact, consumers' leading complaints involved extensive confusion over the available balance and the time of posting debits and credits:



**Figure 3: Top Overdraft Consumer Complaint Issues, by Percentage of Total Complaints**

*Id.*

70.    Consumers are particularly confused by financial institutions' fee practices when "based on their actual review of their available balance, often including any 'pending' transactions, [customers] believed funds were available for transactions they made, but they later learned the transactions had triggered overdraft fees." *Id.* at 9.

71.    Ultimately, unclear and misleading fee representations like those in Defendant's account documents mean that consumers like Plaintiff "who are carefully trying to avoid overdraft, and often believe they will avoid it . . . end up being hit by fees nonetheless." *Id.*

72.    The Federal Deposit Insurance Corporation ("FDIC") has specifically noted that financial institutions may effectively mitigate this wide-spread confusion regarding overdraft

16

practices by "ensuring that any transaction authorized against a positive available balance does not incur an overdraft fee, even if the transaction later settles against a negative available balance." *Consumer Compliance Supervisory Highlights*, FDIC 3 (June 2019), https://bit.ly/3t2ybsY.

73.    Despite this recommendation, Defendant continues to assess OD Fees on transactions that are authorized on sufficient funds.

74.    Defendant was aware of the consumer perception that debit card transactions reduce an account balance at a specified time—namely, the time and order the transactions are actually initiated—and the Contract only supports this perception.

75.    Defendant was also aware of consumers' confusion regarding OD Fees but nevertheless failed to make its members agree to these practices.

### F. Plaintiff Was Assessed OD Fees on Debit Card Transactions Previously Authorized on Sufficient Funds

76.    On or around August 12, 2020 and December 24, 2020, Plaintiff was assessed $31 OD Fees on debit card transactions that settled that day, even though the transactions had been previously authorized on sufficient funds.

77.    Because Defendant had previously held the funds to cover these transactions, Plaintiff's account always had sufficient funds to cover these transactions and should not have been assessed these fees.

### III.    NONE OF THESE FEES WERE ERRORS.

78.    The improper fees charged by Defendant to Plaintiff's account were not errors by Defendant, but rather were intentional charges made by Defendant as part of its standard processing of transactions.

4896-0617-2981, v. 1

79.     Plaintiff therefore had no duty to report the fees as errors because they were not; instead, they were part of the systematic and intentional assessment of fees according to Defendant's standard practices.

80.     Moreover, any such reporting would have been futile as Defendant's own contract admits that Defendant made a decision to charge the fees.

## IV.    THE IMPOSITION OF THESE IMPROPER FEES BREACHES DEFENDANT'S DUTY OF GOOD FAITH AND FAIR DEALING

81.     Parties to a contract are required not only to adhere to the express conditions of the contract but also to act in good faith when they are invested with a discretionary power over the other party. This creates an implied duty to act in accordance with accountholders' reasonable expectations and means that the bank or credit union is prohibited from exercising its discretion to enrich itself and gouge its customers. Indeed, the bank or credit union has a duty to honor transaction requests in a way that is fair to its customers and is prohibited from exercising its discretion to pile on even greater penalties on its accountholders.

82.     Here—in the adhesion agreements Defendant foisted on Plaintiff and its other customers—Defendant has provided itself numerous discretionary powers affecting customers' accounts. But instead of exercising that discretion in good faith and consistent with consumers' reasonable expectations, Defendant abuses that discretion to take money out of consumers' accounts without their permission and contrary to their reasonable expectations that they will not be charged improper fees.

83.     Defendant abuses its discretion in its own favor—and to the prejudice of Plaintiff and its other customers—when it assesses fees in this manner. By *always* assessing these fees to the prejudice of Plaintiff and other customers, Defendant breaches their reasonable expectations

4896-0617-2981, v. 1

and, in doing so, violates its duty to act in good faith. This is a breach of Defendant's implied covenant to engage in fair dealing and to act in good faith.

84.      It was bad faith and totally outside Plaintiff's reasonable expectations for Defendant to use its discretion in this way.

85.      When Defendant charges improper fees in this way, Defendant uses its discretion to interpret the meaning of key terms in an unreasonable way that violates common sense and reasonable consumers' expectations. Defendant uses its contractual discretion to set the meaning of those terms to choose a meaning that directly causes more fees.

## **CLASS ALLEGATIONS**

86.      Plaintiff brings this action on behalf of herself and all others similarly situated pursuant to Fed. R. Civ. P 23.

87.      The proposed Class is defined as:

All Defendant accountholders who, during the applicable statute of limitations, were checking accountholders of TBK Bank, SSB and were assessed an overdraft fee on a debit card transaction that was authorized on sufficient funds and settled on negative funds in the same amount for which the debit card transaction was authorized.

88.      Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

89.      Excluded from the Class are Defendant, its parents, subsidiaries, affiliates, officers, directors, legal representatives, successors, and assigns; any entity in which Defendant has a controlling interest; all customers members who make a timely election to be excluded; governmental entities; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

4896-0617-2981, v. 1

90.    The members of the Class are so numerous that joinder is impractical. The Class consists of thousands of members, the identities of whom are within the exclusive knowledge of Defendant and can be ascertained only by resort to Defendant's records.

91.    Plaintiff's claims are typical of the claims of the Class in that Plaintiff, like all members of the Class, was charged improper fees. Plaintiff, like all members of the Class, has been damaged by Defendant's misconduct in that they have been assessed unlawful fees. Furthermore, the factual basis of Defendant's misconduct is common to all members of the Class and represents a common thread of deceptive and unlawful conduct resulting in injury to all members of the Class. Plaintiff has suffered the harm alleged and have no interests antagonistic to the interests of any other members of the Class.

92.    The questions in this action are ones of common or general interest such that there is a well-defined community of interest among the members of the Class. These questions predominate over questions that may affect only individual class members because Defendant has acted on grounds generally applicable to the Class.

93.    Among the questions of law and fact common to the Class include:

    a.    Whether Defendant violated its Contract by charging fees OD Fees on APSN Transactions;

    b.    Whether Defendant breached its covenant of good faith and fair dealing with Plaintiff and other members of the Class through its fee policies and practices;

    c.    Whether Defendant was unjustly enriched by its fee assessment practices;

    d.    Whether Defendant violated the Illinois Consumer Fraud and Deceptive Practices Act;

    e.    Whether Defendant violated Regulation E;

    f.    The proper method or methods by which to measure damages; and

    g.    The declaratory and injunctive relief to which the Class are entitled.

94.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the members of the Class will continue to suffer losses and Defendant's misconduct will proceed without remedy.

95.     Even if Class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows for the consideration of claims which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

96.     Plaintiff is committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions, particularly on behalf of consumers and against financial institutions. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Class.

97.     Plaintiff suffers a substantial risk of repeated injury in the future. Plaintiff, like all members of the Class, is at risk of additional improper fees. Plaintiff and the Class are entitled to injunctive and declaratory relief as a result of the conduct complained of herein. Money damages alone could not afford adequate and complete relief, and injunctive relief is necessary to restrain Defendant from continuing to commit its illegal actions.

## COUNT I
**Breach of Contract, Including Breach of the Covenant of Good Faith and Fair Dealing**

4896-0617-2981, v. 1

*(**On Behalf of Plaintiff and the Class**)*

98.    Plaintiff realleges and incorporates by reference all the foregoing allegations as if they were fully set forth herein.

99.    Plaintiff and Defendant have contracted for bank account services, as embodied in the Contract. Exs. A-B.

100.    All contracts entered by Plaintiff and the Class are identical or substantively identical because Defendant's form contracts were used uniformly.

101.    Defendant has breached the express terms of its own agreements as described herein.

102.    Under Illinois law, good faith is an element of every contract between financial institutions and their customers because banks and credit unions are inherently in a superior position to their checking accountholders and, from this superior vantage point, they offer customers contracts of adhesion, often with terms not readily discernible to a layperson.

103.    Good faith and fair dealing means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

104.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain and abuse of a power to specify terms.

105.    Defendant abused the discretion it granted to itself when it charged fees on transactions that did not overdraw an account.

106.    Defendant also abused the discretion it granted to itself by defining key terms in a manner that is contrary to reasonable accountholders' expectations.

107.    In these and other ways, Defendant violated its duty of good faith and fair dealing.

108.    Defendant willfully engaged in the foregoing conduct for the purpose of (1) gaining unwarranted contractual and legal advantages; and (2) unfairly and unconscionably maximizing fee revenue from Plaintiff and other members of the Class.

109.    Plaintiff and members of the Class have performed all, or substantially all, of the obligations imposed on them under the Contract.

110.    Plaintiff and members of the Class have sustained damages as a result of Defendant's breaches of contract, including breaches of contract through violations of the covenant of good faith and fair dealing.

111.    Plaintiff and the members of the Class are entitled to injunctive relief to prevent Defendant from continuing to engage in the foregoing conduct.

## COUNT II
## UNJUST ENRICHMENT
### (On Behalf of Plaintiff and the Class)

112.    Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

113.    Plaintiff, individually and on behalf of the Class, assert a common law claim for unjust enrichment. This claim is brought solely in the alternative to Plaintiff's breach of contract claims and applies only if the parties' contracts are deemed unconscionable or otherwise unenforceable for any reason. In such circumstances, unjust enrichment will dictate that Defendant disgorge all improperly assessed fees.

4896-0617-2981, v. 1

114.    Defendant has knowingly accepted and retained a benefit in the form of improper fees to the detriment of Plaintiff and the members of the Class, who reasonably expect to be compensated for their injury.

115.    Defendant has retained this benefit through its fee maximization scheme, and such retention violates fundamental principles of justice, equity, and good conscience.

116.    Defendant should not be allowed to profit or enrich itself inequitably and unjustly at the expense of Plaintiff and the members of the Class and should be required to make restitution to Plaintiff and the members of the Class.

### COUNT III
### VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILCS 505/1, ET SEQ.
### (*On Behalf of Plaintiff and the Class*)

117.    Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

118.    Defendant has violated Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA").

119.    Section 2 of the ICFA, 815 ILCS 505/2, provides:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practices described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

120.    Section 10a of the ICFA, 815 ILCS 505/10A, provides in relevant part:

Any person who suffers actual damages as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in its discretion may award actual economic damages or any other relief which the court deems proper . . .

. . .

(c)    Except as provided in subsections (f), (g), and (h) of this Section, in any action brought by a person under this Section, the Court may grant injunctive relief where appropriate and may award, in addition to the relief provided in this Section, reasonable attorney's fees and costs to the prevailing party.

121.    Plaintiff and other Class members are "consumers" or "persons," as defined under the IFCA, 815 ILCS 505/1, *et seq.*

122.    Defendant's conduct, as alleged in this Complaint, occurred in the course of trade and commerce.

123.    Defendant knowingly and intentionally employed a deceptive policy and practice of charging improper fees as described herein, as well as by employing a deceptive policy and practice by misrepresenting its policy and practice of doing so.

124.    Defendant also engaged in unlawful conduct, made affirmative misrepresentations, or otherwise violated the ICFA by, *inter alia*, abusing its discretion to interpret undefined terms in a manner harmful to consumers and beneficial to Defendant.

125.    Defendant's statements were material and were likely to mislead Class members and, in fact, did mislead Class members.

126.    Defendant made these statements and omissions with the intent that Class members would rely on them.

127.    As a direct and proximate result of Defendant's conduct, Class members have suffered actual damages.

## COUNT IV
### Violation of Electronic Fund Transfers Act (Regulation E)

25

**C.F.R. § 1005 et seq. (authority derived from 15 U.S.C. § 1693 *et seq*.))**
**(*On Behalf of Plaintiff and the Class*)**

128.    Plaintiff incorporates by reference the preceding paragraphs.

129.    By charging overdraft fees on APSN Transactions, Defendant violated Regulation E (12 C.F.R. §§1005 et seq.), whose "primary objective" is "the protection of consumers" (§1005.l(b)) and which "carries out the purposes of the [Electronic Fund Transfer Act 15 U.S.C. §§1693 et seq.), the "EFTA"] (§1005. l(b)), whose express "primary objective" is also "the provision of individual consumer rights" (15 U.S.C. §1693(b)).

130.    Specifically, the charges violated what is known as the "Opt In Rule" of Regulation E (12 C.F.R. § 1005.17.) The Opt In Rule states: "a financial institution ... shall not assess a fee or charge ... pursuant to the institution's overdraft service, unless the institution: (i) [p]rovides the consumer with a notice in writing [the opt-in notice]. . . describing the institution's overdraft service" and (ii) "[p ]rovides a reasonable opportunity for the consumer to affirmatively consent" to enter into the overdraft program. (Id.) The notice "shall be clear and readily understandable." (12 C.F.R. §205.4(a)(l).) To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide its customers a reasonable opportunity to opt-in after receiving the description. The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17.

131.    The intent and purpose of this Opt-In Form is to "assist customers in understanding how overdraft services provided by their institutions operate .... by explaining the institution's overdraft service ... in a clear and readily understandable way"-as stated in the Official Staff

Commentary (74 Fed. Reg. 59033, 59035, 59037, 5940, 5948), which is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Regulation E. *Strubel v. Capital One Bank (USA)*, 2016 U.S. Dist. LEXIS 41487, *11 (S.D. N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Regulation Z)).

132.    Defendant has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide its customers with a valid description of the overdraft program which meets the strictures of 12 C.F.R. § 1005.17. Defendant's opt-in method fails to satisfy 12 C.F.R. § 1005.17 because it misrepresents Defendant's overdraft practices, as discussed above.

133.    As a result of violating Regulation E's prohibition against assessing overdraft fees without obtaining affirmative consent to do so, Defendant has harmed Plaintiff and the Class.

134.    Due to Defendant's violation of Regulation E (12 C.F.R. § 1005.17), Plaintiff and members of the Class are entitled to actual and statutory damages, as well as attorneys' fees and costs of suit pursuant to 15 U.S.C.A. § 1693m.

## PRAYER FOR RELIEF AS TO ALL COUNTS

WHEREFORE, Plaintiff, individually and on behalf of the members of the Class, respectfully request the Court to enter an Order:

a.    certifying the proposed Class, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class counsel;

b.    declaring Defendant's fee policies and practices alleged in this Complaint to be wrongful and unconscionable in light of its contractual promises;

c.    enjoining Defendant from breaching its Contract or misrepresenting its true practices;

d.      awarding Plaintiff and the Class restitution in an amount to be proven at trial;

e.      awarding actual damages in an amount according to proof;

f.      awarding pre-judgment and post-judgment interest at the maximum rate permitted by applicable law;

g.      awarding costs and disbursements assessed by Plaintiff in connection with this action, including reasonable attorneys' fees and costs pursuant to applicable law; and

h.      awarding such other relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiff, by counsel, demands trial by jury.

Dated: October 3, 2022            Respectfully submitted,

                           /s/ Justin M. Raver
                   Justin M. Raver (ARDC#6293618)
                   **BARASH & EVERETT LLC**
                   211 West Second Street
                   Kewanee, IL 61443
                   Telephone: (309) 852-5555
                   justin@barashlaw.com

                   Lynn A. Toops*
                   **COHEN & MALAD, LLP**
                   One Indiana Square, Suite 1400
                   Indianapolis, Indiana 46204
                   Telephone: (317) 636-6481
                   llafornara@cohenandmalad.com

                   Martin F. Schubert*
                   **BRANSTETTER, STRANCH**
                   **& JENNINGS, PLLC**
                   223 Rosa L. Parks Avenue, Suite 200
                   Nashville, Tennessee 37203
                   Telephone: (615) 254-8801
                   gerards@bsjfirm.com

Christopher D. Jennings*
**JOHNSON FIRM**
610 President Clinton Avenue, Suite 300
Little Rock, Arkansas 72201
Telephone: (501) 372-1300
chris@yourattorney.com

*\* Pro Hac Vice* applications to be submitted

*Counsel for Plaintiff and the Proposed Class*

4896-0617-2981, v. 1